(63 South. 624.)

No. 19,556.

WHEELER v. BRITTON.

(Nov. 3, 1913. Rehearing Denied Dec. 15, 1913.)

*(Syllabus by the Court.)*

1. DIVORCE (§ 78*)—SEPARATION FROM BED AND BOARD—APPOINTMENT OF CURATOR AD HOC—VERIFICATION OF PETITION.

In an action for separation from bed and board against an alleged absent defendant, though the defendant must in fact be absent in order to warrant the appointment of a curator ad hoc, it is not necessary, under Act No. 296 of 1910, to the validity of such appointment or of the citation served upon the appointee, that the petition alleging such absence should be sworn to.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 256, 257; Dec. Dig. § 78.*]

2. DIVORCE (§ 37*)—ACTION FOR SEPARATION —DEFENSE.

Where a wife, defendant in a suit for separation from bed and board, has abandoned the common domicile for a cause wholly insufficient, and adheres to the view that the cause, still existing, was, and is, sufficient to justify the abandonment and its continuance it would seem to be immaterial, for the purposes of the suit, what course the husband may have pursued in order to induce her to return, since, no matter what the course may have been, she would still remain away, for the original supposed cause. But, in any event, where, in such case, the plaintiff, endeavoring, in good faith, and for their common welfare and that of the family, to bring about the return of the defendant, commits an error of judgment in the matter of the course pursued, the fault, or misfortune, should be attributed to the defendant, who had brought about a situation in which it was difficult to determine what was best to be done, and she should not be allowed to make use of such error as justification for the continued abandonment.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 27, 107–134, 136–138; Dec. Dig. § 37.*]

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Suit by A. B. Wheeler against Eliza M. Britton, his wife. From judgment for plaintiff, defendant appeals. Affirmed.

Edmund Burke, of Washington, D. C., Frederick P. Russell, and Chas. Louque and D. H. Théard, both of New Orleans, for appellant. Denegre & Blair and Henry H. Chaffe, all of New Orleans, for appellee.

Statement of the Case.

MONROE, J. This is a suit for separation a mensa et thoro and for the provisional custody of minor children, and, it being alleged that defendant was absent from this state, an attorney and curator ad hoc was appointed to represent her and citation and reiterated summonses, addressed to defendant, were served upon him, as were also the reiterated notices of the preliminary judgment. The curator ad hoc asked that an inventory of the community property be ordered, which was done. After the preliminary judgment. had been rendered and notice thereof served, defendant appeared, by counsel, and filed an exception, to the effect that the citation had been served upon a curator ad hoc, who had been illegally appointed, inasmuch as the petition praying for his appointment had not been sworn to, and praying that the judgment predicated on said citation be decreed void. Thereafter defendant, through her counsel, reserving her rights under the exception, filed an answer, and, some time later, the exception was overruled. The answer alleges that defendant left the common domicile, in New Orleans, in August, 1906, with the approval and consent of plaintiff, and under advice, and went to Atlantic City (New Jersey), where she was residing, with her mother and sister, at the St. Charles Hotel, when she received a letter from plaintiff to the effect that she must stop her wasteful expenditure of money and that he had notified certain merchants in New York that he would not be responsible

for debts which she might thereafter contract; that the proprietor of the hotel also received a letter from plaintiff advising him that plaintiff would not be responsible for bills contracted by defendant, and further referring to defendant as follows:

"Confidentially speaking—from the reports I have received from eminent physicians in New York—she is not mentally responsible for her acts, and I resorted to all kinds of means and measures to get her home, so that she could be properly treated, but she has taken such a violent dislike to me that all efforts, so far, have failed."

The petition further alleges that, in view of the contents of the letter thus quoted, of the fact that she was paying her own expenses, including railroad fare and hotel bills, of information and warnings that she had received, defendant concluded that plaintiff's main object and purpose in desiring her to return to New Orleans was to have her confined in some asylum or sanitarium, against her will; that she, subsequently, drew her drafts upon the firm of which plaintiff is a member and which held some $20,000 of her assets, and, through plaintiff's instrumentality, the drafts were protested; that she also drew upon Britton & Koontz Bank, at Natchez, where she also had a large balance to her credit, with the same result, the drafts being refused payment at the instance of the plaintiff; and that she was thereby left practically destitute; "and this condition was brought about through and by the efforts of the complainant in this cause; and, through and by fear of being confined in an asylum, this respondent considered and now considers herself entirely justified in remaining out of the jurisdiction of the state of Louisiana." Defendant "denies that she has withdrawn from the common dwelling, willingly or intentionally, but has done so through fear of the threats of the complainant to have her confined in a mad house." She alleges:

"That complainant has been untrue and unfaithful to this respondent; that he has neglected to perform the duties required of him; that he has contributed nothing towards the support and maintenance of this respondent, and, while this respondent is amply able, with her own means, to provide for her own maintenance and support, nevertheless such fact does not relieve complainant of his duties in that respect," etc.

It will thus be seen that the gist of the defense is that plaintiff has threatened to confine defendant in an asylum for the insane; that he has failed and refused to provide for her maintenance; and that he has interfered to deny her the use of her own means for that purpose.

It is admitted that the litigants were married in Natchez, Miss., in 1882; that they came, immediately, to New Orleans, where they established a matrimonial domicile, which they retained, as such, until its abandonment by defendant in 1906; that there are four children, issue of the marriage, to wit: Two, a son and daughter, who have attained majority; and two minor sons, who, in 1906, were in their thirteenth and ninth years, respectively. It is also admitted that defendant left home, to visit the North, in 1906, with the consent of her husband, and it is undisputed that she was accompanied by her daughter, her two minor sons, and a niece, and that she joined her mother and her unmarried sister at her place of destination. It appears from the evidence that, at the Chicago Exposition, in 1893, plaintiff and defendant made the acquaintance of a Mr. and Mrs. Steele, who, as we infer, lived in New York, and with whom they became exceedingly intimate—so much so that the Steeles afterwards, at times, visited the Wheelers, at their home in New Orleans, and eventually (though just when the arrangement was first entered into does not appear) the two families lived in the same house, at Flushing, Long Island, and perhaps at another place, Mr. Steele's family consisting of himself, his wife, his, or her, mother, and

a son, and the impression received by Mrs. Wheeler's near relatives and family connections being that the establishment was maintained at the expense of Mr. Wheeler. For about 2½ years prior to the spring of 1906, Mrs. Wheeler, with her children, or some of them, remained altogether in the North, residing with the Steeles, either in the Flushing house or elsewhere. She had with her as a guest, up to, say January, 1906, a daughter (by first marriage, as we understand) of Mr. Wheeler's brother (W. A. S. Wheeler), whose present wife is Mrs. Wheeler's sister. During the winter of 1906–07, the parents desired the young lady to return to her home, in Natchez, and Mr. Connor, a member of the Natchez bar, whose wife is also a sister of Mrs. Wheeler, went to New York in order to escort her to Natchez, and, while in New York, paid several visits to the Flushing house, concerning which, and concerning the apparent relations which subsisted between Mrs. Wheeler and the Steeles, he testifies, in part, as follows:

"Q. Did you ever see Mrs. Wheeler when she was in the presence of Mr. C. B. Steele? A. I did. Q. Where? A. In Flushing, N. Y. Q. How far apart were the houses in which the Steeles and Wheelers were living? A. They were living in the same house. Q. How long did you stay there, and how often did you see them together? A. I spent two evenings there; on Thursday, the 11th of January, 1906, and Sunday, the 14th of the same month, from about an hour before sunset until about 10:30 in the evening. Q. If you saw them together, did you notice anything, and, if so, what, in their attitude towards one another—by one another I mean Mrs. Wheeler and Mr. Steele. A. I did. Q. What was it? A. It is hard to describe that in a few words. Q. Well go ahead and describe at length and go into the whole business? * * * A. There seemed to be the most cordial and affectionate friendship and intimacy. They all called each other by their Christian names. When either Mr. or Mrs. Steele spoke, Mrs. Wheeler seemed deeply interested. She frequently repeated or quoted, in her conversation, things that one or the other had said, and, in a certain matter which came up—was brought up by Mr. Steele—Mrs. Wheeler showed her entire confidence and belief in what Mr. Steele was stating and claiming about a certain discovery which he had made of a new force in nature. Q. What oc-

casion had you, or was there any occasion, for you to make any mental note of the relationship which apparently existed between Mr. and Mrs. Steele and Mrs. Wheeler? A. Yes, on account of the intimacy, so far as it was known to me to exist, between the Steele and A. B. Wheeler families, and the objections to this intimacy entertained by members of Mrs. Wheeler's family, and on account of the nature of my mission to New York when I saw them at Flushing. I had gone to New York on the strength of a telegram from Mrs. Wheeler (probably referring to a telegram from Mrs. W. A. S. Wheeler), and visited the house in which they were all living to carry out the directions contained in that telegram. Q. You refer, as I recall the answer you have just made, to the attitude of the members of Mrs. Wheeler's family, relative to the intimacy which existed between Mrs. A. B. Wheeler and the Steeles; what was that attitude? * * * A. They strongly objected to it. Q. What was the mission that you went to New York on? A. To bring to Natchez Miss Julia Wheeler, the daughter of Mr. W. A. S. Wheeler, who was then a member of the A. B. Wheeler household, in Flushing. Q. What have you to say, if anything, or can you give us any information relative to any influence, if any, that the Steeles had over Mrs. A. B. Wheeler? A. Mr. Chaffe, that is a matter of my opinion. Q. How did you acquire that opinion? A. From communications to me from the members of the A. B. Wheeler household, and from my personal observation when in Flushing. * * * Prior to my visit to Flushing, my opinion was such as one entertains as to the reputation of any man or woman in a community of whom he learns from others. My only opportunity for personal observation was on the occasions of my two visits to Flushing. Q. What effect did that visit and your observations made there have on your previous opinion? A. It confirmed my opinion. Q. What was your previous opinion? (Objection.) A. That Mrs. Wheeler was completely under the dominion and influence of Mr and Mrs. Steele. Q. Now, Mr. Connor, can you tell us what was the cause of the disagreement that existed between Mr. and Mrs. A. B. Wheeler in 1906 and 1907? A. Yes, I think I know—" By Mr. Théard (representing defendant): "Q. Of your own knowledge? A. I was going on to say, Mr. Théard, based upon letters that I have seen from Mrs. Wheeler and Mrs. Steele and statements made to me by Mr. Clinton, after his visit to New York, and from statements made to me by Mr. A. B. Wheeler, based on those sources, it was the act of Mr. Wheeler in bringing his family away from New York, where they had lived with the Steeles for about 2½ years, and of prosecuting Mr. Steele, criminally, in the courts of New York. Q. Did Mrs. Wheeler acquiesce in that prosecution, or did she protest against it? A. She objected to it. Q. Please state whether or not you ever heard

any other cause ascribed for the disagreement existing between Mr. and Mrs. Wheeler? A. I never heard of any."

Mr. Connor's testimony, above quoted, is a temperate statement of the views entertained (and expressed in their testimony) by Mrs. Wheeler's two sisters, Mrs. Connor and Mrs. W. A. S. Wheeler, as to her relations with the Steeles; and though her unmarried sister, Miss Selah Britton, appears to be supporting defendant in her present situation, she does not express herself upon that subject. Mr. Connor's reference to the criminal prosecution of Mr. Steele, to Mr. Wheeler's bringing his family home from New York, in the spring of 1906, and to Mr. Clinton, is based upon the following facts, disclosed by the evidence, to wit: Some time prior to the year 1906, Mr. Steele is said to have represented that he had discovered a new motive power, and was in the way of having his discovery patented, of organizing a corporation with millions of capital, for its exploitation, of selling the right to make use of it, etc., and, upon the faith of those representations, the plaintiff herein is said to have turned over to Mr. Steele, as an investment, some $25,000 or more, only to find out that the representations were false and that he had acquired nothing for his money save an unpleasant experience. Upon making that discovery, he, in the early winter, probably, of 1906, caused the matter to be laid before the grand jury of New York county, which body, thereupon (in March, as we understand), brought in an indictment, charging Mr. Steele with "stealing," and with "grand larceny in the first degree," and he was tried for that offense, with the result that the jury disagreed. Mr. and Mrs. Wheeler also disagreed upon the subject of the prosecution, and her sympathies were so entirely with Mr. Steele, and against her husband, that during the trial, though the latter was for several days very sick, she failed to see him, and after the trial she was very reluctant to return with him and her family to her house in New Orleans. The Christian names of Mr. and Mrs. Steele, it appears, are Frances and Charles, and there was offered in evidence a written instrument, of considerable length, shown to be in the handwriting of defendant, which begins, "My Dearest F. & C." Where, or how, it was obtained, the record does not show; nor does it appear that it ever reached the parties to whom it was addressed; nor do we find those facts material, since it appears from the text that it was written upon the eve of the writer's departure from New York and contains a most frantic outpouring of her feelings, of sympathy for the Steeles, and of bitter resentment to her husband. We refer to this instrument as indicating the reluctance of defendant to return to her home, as showing that she did so with the fixed determination of going back to New York, at an early date, of showing that plaintiff, in his distraction, and in order to induce her to leave there, promised that she should go back, and that, all the circumstances considered, it is most probable that she went back with the intention of not again returning. We quote, with sincere regret, a few passages from this remarkable writing, which, though nominally addressed to "F. & C.," appears to have been intended almost entirely for "C.," to wit:

"You get out of your difficulties; but for this, I could have stood my grounds; it was most unfortunate you were unprepared. Now show what stuff you are made of, make him small in your success. I am praying for this. * * * This is my destination always, and my health will hurry (me—possibly) back, after a little. I can't be won after this. * * * I have either to break up or go for a time. * * * G. (referring, no doubt, to plaintiff, whom she and other intimates call Gus) is desperate, seeing that I can't control myself, and is nearly crazy; so, for a little while, the children beg me to go. * * * I am so unhappy to go off in this way that I would die if I did not know I would be back. He promises, and I will. In the meantime, come out of this difficulty and he cannot object to anything."

In the latter part of August, therefore, defendant, with such consent from her husband as may be inferred from what has been stated, went back to New York, accompanied by her grown daughter, the grown niece referred to in the testimony of Mr. Connor, and her two minor sons. Thereafter, on September 5th and 7th, plaintiff wrote to her two such affectionate letters as ordinarily pass between husband and wife. On September 14th he wrote as follows:

"I do not know how to head this letter, as, from your treatment of me, for the past six months, I am led to believe that you have lost all affection for me. I have not written to you as I suppose you do not care whether you hear or not. I received your telegram and am glad to know you found your ear-rings. There are two things I would like to call your attention to; the first is the boys schooling. Nearly all the schools open here the first part of October, and I want them back at that time so as not to lose any more time. The next thing is about making bills in New York. This thing of your having carte blanche to make bills as large as you want must stop. I have to work hard for the money I make and it is not right that you should throw it away. I have put the house in the hands of a real estate agent for sale as I find that I cannot afford to live in it, and must sell it. I shall expect you to come back when the boys do."

On September 29th, plaintiff wrote, advising defendant that he had notified certain merchants in New York that he would not be responsible for bills contracted in his name, save upon his written orders, and adding:

"I have (done) this to stop the wasteful expenditure of money that has been going on for years, which I told you, in my last letter, must stop. I write this to avoid any embarrassment to you, should you go to New York."

Neither the plaintiff nor the defendant, it is to be remembered, are competent witnesses in this case, and hence we are without any explanation, which plaintiff might give, of his reasons for writing the letters thus quoted. It may be that, in the interval, after his letter of September 7th, the letter of defendant, to which we have referred, came into his possession, and it is fair to assume that he received, or had reason to believe that he would receive, bills from New York, which defendant had contracted and to which he objected. At all events, considering what defendant's feeling and attitude towards him had been, during the preceding six months, there is nothing in the letter of September 14th which afforded her reasonable ground for permanently abandoning the common domicile. His request, or demand, that she return home by October 1st was not complied with; nor did she send the boys; and her continued absence became a source of greater distress to all who were interested in her, as it became more and more prolonged. Plaintiff had conferred with her brother-in-law, Mr. Connor, about the situation in May, and on September 26th they had another conference; Mr. Connor having come to New Orleans, at plaintiff's request, for that purpose. Later, in December, 1906, plaintiff went to Natchez and there consulted the different members of the family, including Mr. Jas. A. Clinton, who was on the most friendly terms with both his wife and himself, and who had married defendant's first cousin, reared in her family; the result of the conference being that Mr. Clinton consented to go to New York and endeavor to persuade defendant to return home with her children, or to return to Natchez, where her family reside, or to go to Sewanee, where the boys could attend the University of the South. Mr. Clinton, accordingly, went to New York (at plaintiff's expense) and endeavored to execute his mission, but wholly without success. As he died in the course of the year 1907, his testimony could not be obtained for the purposes of this case, which was not instituted until February, 1911. He, however, wrote several letters to plaintiff, and among them one, dated December 31, 1906, reading in part as follows:

"Since our interview on yesterday, I thought the matter of writing Mr. Newlin Haines, of the St. Charles hotel, over (referring to the proprietor of the hotel at Atlantic City at

which defendant was then stopping), and came to the conclusion that we had better wait for further developments. If E. (referring to defendant, whose name is Eliza) does not return home with Aunt E. (referring to the defendant's mother) she will certainly not remain in Atlantic City, but will move over to New York, and, therefore, there will be no necessity of writing Mr. Haines, as our folks will, in all probability, leave before your letter reaches him. I talked the matter over with Will, and he agreed with me, I enclose a pencil sketch of what I would write—all in the event you have to write any one in reference to the subject."

The pencil sketch, thus referred to, reads:

"As unpleasant as it is, yet circumstances compel me to notify you that I will not be responsible for any bills incurred by my wife at your hotel, and I ask that you impart this information to her. I dislike thus to humiliate her, but I am forced in a position where heroic measures have to be resorted to. Confidentially speaking, from reports I have received from eminent physicians in New York, she is not, mentally, responsible for her acts, and I resorted to all kinds of measures to get her home, so that she can be properly treated, but, she has taken such a violent dislike to me that all efforts, so far have failed."

As defendant did not return with her mother, plaintiff, on January 22, 1907, wrote to the proprietor of the hotel as suggested by Clinton, the conclusion arrived at by him, and her relations and friends, being that the only way to bring her home would be to cut off her supply of money. Defendant, it may here be stated, had received, from different sources, $3,500, between November 1st and December 31st, and the idea that she had not paid her past-due hotel bills, probably, did not occur to any one. Somewhat later, she offered the proprietor of the hotel her note, which he tendered to the Britton & Koontz Bank of Natchez, for discount; but the bank, the officers of which were her friends, declined to accept the note for discount. They, however, wrote that it was perfectly good, and that the bank would furnish the money to pay her bill and her expenses home, if she was willing to come. Defendant being still unwilling to return, the proprietor, eventually, took possession of her rooms and of the trunks of herself and family, a result which we are satisfied was unexpected to plaintiff and to defendant's relatives. The bill was, subsequently, paid by Miss Selah Britton, to whom plaintiff refunded the money when he learned that the payment had been made. Defendant, in the meanwhile, went to another hotel, whence, after a short stay, she found accommodations in a boarding house. About the month of April, 1907, plaintiff sent his eldest son to Atlantic City, with instructions to endeavor, as of his own impulse, to persuade his mother to return home with her other children; but the young man found that defendant had left the children at the boarding house with a negro maid servant, and had gone to Washington City, on what mission no one knew, or yet knows. He succeeded in having the boys communicate with her (not thinking it advisable to use his own name) and in securing assurances from her that she would return the next day; but the next day, and the next, and still others passed, and, after waiting three weeks, he returned to New Orleans, bringing his brothers with him.

Defendant has some means of her own, but they are not so large as she seems to think. If, as she alleges in her answer, she furnished the money to pay the entire expense of her party from the time they left New Orleans, in August, 1906, including her hotel bills, the record fails to show it. The $3,500, to which we have referred, was however, obtained upon her own credit; $1,000, by draft on Britton & Koontz Bank (which overdrew her account by $20); $1,000, which she borrowed from her mother; and $1,500 which she drew against her account with the firm of which plaintiff is a member. Plaintiff did request, or direct, the Britton & Koontz Bank to make no loans or advances and pay no money to defendant, but, save to inform defendant that it had received it, the

bank never acted upon that request, and, as we gather from the testimony, would not have refused to honor any draft drawn by her against her funds in its possession. In 1911, it loaned her $5,000, and in 1912, an additional $5,000, and those amounts, with an overdraft of some $93, were due it when this case was tried. Defendant had over $20,000 of assets in the hands of plaintiff's firm, but, acting under plaintiff's instructions, it refused to pay a draft drawn by her. It is not clear whether the assets in question are held subject to draft; but we shall assume, for the purposes of this case, that they are, and that plaintiff exceeded his authority and legal right in refusing to deliver to her the whole, or any part, of such assets, on demand.

### Opinion.

[1] The only question presented by the exception is whether, in a case such as this, defendant can legally be cited, through a curator ad hoc, to answer an unsworn petition alleging her absence from the state. Defendant cites the case of Whitney v. Finnegan, 129 La. 572, 56 South. 512, as supporting the contrary view. But the petition in that case was filed in 1909, and the decision construed and applied only the law existing at that time; whether correctly or incorrectly, is immaterial to this case, which is governed quoad the question at issue by Act 296 of 1910, which provides:

"That in any action for separation from bed and board or divorce, where the defendant is absent from the state, * * * the court having jurisdiction over the cause shall, upon the application of any party in interest, appoint a curator ad hoc to represent such absent party," etc.

The Code of Practice (article 737) provides that, where the debtor of a privilege or mortgage is absent and not represented in the state, "the judge, at the request of the plaintiff, shall appoint him an attorney, to whom notice of the demand shall be given," etc.

And in Frost v. McLeod, 19 La. Ann. 80, the point being made that there was no proof that defendant was absent, the court said:

"To this, it is successfully replied that the article 737, C. P., under which the appointment of an attorney was made, does not require the plaintiff to make oath of the fact of absence, as contended for, and it is not suggested that authentic evidence of such fact is required; nor is it intimated that defendant is not absent. The article in question simply provides that, if the debtor, who has granted the mortgage, is absent and not represented in the state, the judge, at the request of the plaintiff, shall appoint him an attorney, to whom notice of the demand shall be given in the manner directed, and contradictorily with whom the seizure and sale shall be prosecuted. It does not say on proof of the absence, and we are not informed of any law requiring such antecedent proof. The analogy to the conservatory writs is not maintained, as, in those proceedings, facts to be verified by oath are made by law a basis of the writ."

The doctrine of the case thus cited was categorically affirmed in the matter of Monition of John Hall, Opposition, etc., 21 La. Ann. 692, where the court added:

"The opponents in this proceeding have not even attempted to prove (as they might surely have done, if such were the truth) that they were not absentees at the time the executory proceedings were taken."

In the case of Whitney v. Finnegan, relied on by defendant, it was said, in the opinion of the court:

"Again, it is not evident that the defendant was an absentee. True she was not present when the petition was filed on the 8th day of February, 1909. But she was present in the city, stopping here, when two of the notices to return were served on the curator."

In the instant case, not only (to use the language of the court in the case of Frost v. McLeod, supra) "is it (not) intimated that defendant is not absent," but it is shown, conclusively, and is undenied, that she has never returned to New Orleans, since she left here, in August, 1906, and, moreover, that for several years prior to the trial of this case she had never communicated with her children. In the case of Huber v. Jennings-Heywood Oil Syndicate, 111 La. 757,

35 South. 889, this court again affirmed the doctrine of the case of Frost v. McLeod, and again referred to the fact that the absence of the defendant was not denied. It was there asserted that, before leaving the state, the defendant in the writ "had given a power of attorney to a shoemaker in Lake Charles." This court, however, held that, as neither the payee nor the holder of the security sued on were ever informed that such power of attorney had been given, the curator ad hoc was properly appointed.

The other points, with reference to the citation, which are discussed in the brief of defendant's counsel, are not raised by the pleadings and will not be considered here. We have, however, observed that the points in question are sustained by neither the facts nor the authorities relied on in their support.

[2] Upon the merits of the case, we have little to add to the finding of facts which precedes this opinion. If it be true, as we have found it to be, that defendant abandoned her home because of the hostile feeling to her husband, engendered by his prosecution of one whom she considered her friend; and if it be true, as we find it to be, that defendant's views upon that subject have not changed, and that she considers now, as she considered then, that, for the reason stated, she was justified in leaving defendant, and, for that reason, is justified in remaining away, then, since we hold that her view is erroneous, and that plaintiff cannot properly change his attitude with respect to the original estrangement, the question of the propriety of the course pursued by him in order to induce defendant to return home would seem to be immaterial, since, no matter what his course might have been, she would still remain away. Without, however, going into the details of the question, whether plaintiff erred, our conclusions, upon a deliberate consideration of the whole case, are: That he never conceived the idea of placing defend-

ant in any asylum or sanitarium, but desired and endeavored to bring about her return home, in order that she might be restored to her family, where she of right belongs, and, in its midst, receive and act upon such competent medical advice as her condition would seem to require; that, in his efforts to induce her to return, he acted upon the advice and with the co-operation of those of her nearest relatives and friends who were best informed as to the situation and from whom she had never before been alienated, with the earnest desire, upon the part of all of them, to promote her welfare and happiness, as well as that of her husband and family; that, if in the course pursued there was any error of judgment, the fault, or misfortune, should be attributed to defendant, who brought about a situation in which it was difficult to know what was best to be done; and that such error cannot properly be used to sustain the defense here set up, and as justification for defendant's continued abandonment.

We find the judgment appealed from to be correct, and it is, accordingly:

Affirmed.

BREAUX, C. J., concurs in the decree.